



UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JACQUELINE MUSANTE          :    CIVIL ACTION
                                 NO. 3:01CV2352(MRK)

V.                          :

NOTRE DAME OF EASTON
CHURCH                      :    NOVEMBER 4, 2003

## DEFENDANT"S SUPPLEMENTAL BRIEF IN SUPPORT OF DEFENDANT"S MOTION FOR SUMMARY JUDGMENT

In accordance with this Court's order of October 22, 2003, the defendant hereby submits this supplemental brief in support of its Motion for Summary Judgment.

### I.    THE MINISTERIAL EXCEPTION TO THE FREE EXERCISE CLAUSE IS A QUESTION OF LAW FOR THE COURT.

The question of the applicability of the ministerial exception to the Free Exercise Clause of the First Amendment to the United States Constitution is a question of law for the Court.  EEOC v. Southwestern Baptist, 651 F.2d 277, 285 (5th Cir. 1981), cert. denied, 456 U.S. 905, 102 S.Ct. 1749 (1982); Guinan v. Roman Catholic Archdiocese of Indianapolis, 42 F.Supp. 2d 849, 852 (S.D.Ind. 1998); Miller v. Bay View United Methodist, 141 F.Supp.2d 1174, 1181 (E.D. Wis. 2001).  If the exception applies, then

01110.0254

315 Post Road West
Westport, CT  06880

HALLORAN
& SAGE LLP

Phone (203) 227-2855
Fax (203) 227-6992
Juris No. 412195

the Court lacks jurisdiction over this matter.  Id.  This is because ecclesiastical matters

are shielded from court inquiry by the Free Exercise Clause.  (citations omitted.)

Rayburn v. General Conference of Seventh-Day Adventists, 772 F.2d 1164, 1168 (4th

Cir. 1985), cert. denied, 478 U.S. 1020, 106 S.Ct. 3333 (1986).

Several courts have applied the ministerial exception and dismissed cases under

Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6).  See Miller, supra; Alicea-

Hernandex v. Catholic Bishop of Chicago, 320 F.3d 698 (7th Cir. 2003); Bryce v.

Episcopal Church in the Diocese of Colorado, 289 F.3d 648 (10th Cir. 2002); E.E.O.C. v.

Roman Catholic Diocese of Raleigh, N.C., 213 F.3d 795 (4th Cir. 2000); Bollard v.

California Province of Society of Jesus, 196 F.3d 940 (9th Cir. 1999), rehearing denied

211 F.3d 1331 (2000); Combs v. Central Texas Annual Conference of United Methodist

Church, 173 F.3d 343 (5th Cir. 1999); Bell v. Presbyterian Church (U.S.A.), 126 F.3d

328 (4th Cir. 1997); E.E.O.C. v. Catholic University of America, 83 F.3d 455 (D.C. Cir.

1996); Young v. Northern Illinois Conference of United Methodist Church, 21 F.3d 184

(7th Cir. 1994).  Other courts have applied the ministerial exception and granted

summary judgment pursuant to Federal Rule of Civil Procedure 56.  Guinan, supra;

Smith, supra; Rayburn, supra; Gellington v. Christian Methodist Episcopal Church, Inc.,

203 F.3d 1299 (11th Cir. 2000); Starkman v. Evans, 198 F.3d 173 (5th Cir. 1999); Rosati

v. Toledo Ohio Catholic Diocese, 233 F.Supp.2d 917 (N.D. Ohio 2002); Bryce v.

Episcopal Chruch in Diocese of Colorado, 121 F.Supp.2d 1327 (D.Colo. 2000).  Thus, it

- 2 -

315 Post Road West
Westport, CT  06880

HALLORAN
& SAGE LLP

Phone (203) 227-2855
Fax (203) 227-6992
Juris No. 412195

is clear that this Court may decide this question of law based on the materials

presented by the parties in support of and in response to the defendant's Motion for

Summary Judgment. There is no need for the Court to hold a hearing at this point on

the applicability of the ministerial exception[1].

## II.   THE PLAINTIFF'S JOB DUTIES WERE MINISTERIAL AND THE MINISTERIAL EXCEPTION TO THE FREE EXERCISE CLAUSE APPLIES TO THIS CASE.

In this case, the Court should apply the ministerial exception and grant the

defendant's Motion for Summary Judgment. The ministerial exception is based upon

"the actual duties and responsibilities of the individual." Hartwig, 93 F.Supp.2d. at 207.

"If the employee's primary duties consist of teaching, spreading the faith, church

governance, supervision of a religious order, or supervision or participation in religious

ritual or worship, he or she should be considered 'clergy'." Id. "If their positions are

important to the spiritual and pastoral mission of the church, employees should be

considered clergy." (Internal quotations omitted)(citations omitted.) Id.

The plaintiff held the positions of Director of Religious Education ("Director") and

Pastoral Assistant ("Assistant")[2]. As identified by Monsignor Driscoll, the plaintiff's job

---

1.   The defendant notes that even if this Court denies the Motion for Summary Judgement, the defendant may still present raise the argument again at trial after presenting additional evidence. Hartwig v. Albertus Magnus College, 93 F.Supp. 2d 200, 212 fn 14 (D.Conn. 2000).

2.   Since the plaintiff's termination, the two positions have continued to be held by one individual. (See Affidavit of Monsignor Driscoll attached as Exhibit A and Church bulletins attached as Exhibit B.)

315 Post Road West
Westport, CT  06880

HALLORAN
& SAGE LLP

Phone (203) 227-2855
Fax (203) 227-6992
Juris No. 412195

duties and responsibilities consisted of teaching, spreading the faith, and supervision or participation in religious ritual or worship. (See Exhibit A,¶ 16 - 24.) They did not somehow change under Monsignor Driscoll as argued by the plaintiff. (See Exhibit A, ¶ 18, 23.) The plaintiff admits that she was involved with coordinating the Religious Education program, including the recruiting and interviewing of teachers for the program. (See plaintiff's Local Rule 56(a)(2) Statement, I. ¶ 22 - 24; plaintiff's deposition, p. 101-102, attached as Exhibit C). She also admits to coordinating sacramental programs and children's masses, and taking communion to the homebound and ill. (See plaintiff's Local Rule 56(a)(2) Statement, I. ¶ 22 - 24; Exhibit C, p. 141.) She also has admitted, by failing to deny, that her job responsibilities included duties that consisted of teaching, spreading the faith, and supervision or participation in religious ritual or worship. (See plaintiff's Local Rule 56(a)(2) Statement at ¶ 5 - 15.) Based on the above, no genuine issue of material fact exists to be tried as to the applicability of the ministerial exception.

Even analyzing the alleged secular tasks that the plaintiff alleges to have completed under Monsignor Driscoll leads to the same conclusion. The plaintiff lists tasks that she alleges to have completed under Monsignor Driscoll as support for her claim that her job duties and responsibilities were secular. (See plaintiff's Local Rule 56(a)(2) Statement, II. ¶ 5). However, these tasks are fundamental to the church's teaching and are part and parcel of the plaintiff's responsibility to teach and proclaim

315 Post Road West
Westport, CT 06880

HALLORAN
& SAGE LLP

Phone (203) 227-2855
Fax (203) 227-6992
Juris No. 412195

the Catholic ministry to the Parish.  (Exhibit A, ¶ 19.)  The plaintiff simply cannot remove

herself from the ecclesiastical nature of her job duties and responsibilities despite her

efforts to do so.  The Director and the Assistant positions at Notre Dame of Easton

cannot be separated from the ministerial nature of their duties.  It is quite clear that

these positions and the duties and responsibilities thereunder are "important to the

spiritual and pastoral mission of the church."  <u>Rayburn</u>, 772 F.2d at 1168 (citations

omitted.)  Therefore, the plaintiff should be considered clergy for purposes of the

ministerial exception and summary judgment should enter in favor of the defendants.

<u>Id</u>.

THE DEFENDANT:

By _____
Brett M. Szczesny of
HALLORAN & SAGE  LLP
Fed. Bar #ct 19560
315 Post Road West
Westport, CT 06880
(203) 227-2855

- 5 -

315 Post Road West
Westport, CT  06880

HALLORAN
& SAGE LLP

Phone (203) 227-2855
Fax (203) 227-6992
Juris No. 412195

## CERTIFICATION

This is to certify that on this ____ day of November, 2003, I hereby mailed a copy of the foregoing to:

Stuart M. Katz, Esq.
Courtney George, Esq.
Cohen and Wolf, P.C.
1115 Broad St.
Bridgeport, CT 06604

_____
Brett M. Szczesny

481022.1(HS-FP)

315 Post Road West
Westport, CT 06880

HALLORAN
& SAGE LLP

Phone (203) 227-2855
Fax (203) 227-6992
Juris No. 412195

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JACQUELINE MUSANTE      :     CIVIL ACTION
                                                NO. 3:01CV2352(MRK)

V.                                  :

NOTRE DAME OF EASTON
CHURCH                 :      NOVEMBER 3, 2003

### AFFIDAVIT OF REVEREND MONSIGNOR THOMAS DRISCOLL

I, REVEREND MONSIGNOR THOMAS DRISCOLL, being duly sworn, hereby depose and say:

1.     I make this affidavit based upon personal knowledge and belief.

2.     I am over the age of eighteen years and believe in the obligations of an oath.

3.     I am currently the Pastor of Notre Dame of Easton parish and have held this position since January 22, 1999.

4.     When I assumed the position of Pastor, the plaintiff held the positions of Director of Religious Education and Pastoral Assistant.  Deacon Ralph Hammock assumed these positions after the plaintiff.  Presently, the positions are held by Deacon

01110.0254

315 Post Road West
Westport, CT  06880

HALLORAN
& SAGE LLP

Phone (203) 227-2855
Fax (203) 227-6992
Juris No. 412195

Vincent J. Heidenreich. The job positions and duties of the Director of Religious Education and Pastoral Assistant have not changed since I became Pastor and I did not change the job positions and duties of either position when I became Pastor. The job positions and duties remained the same as they were under Father Hyl who held the position of Pastor immediately before me.

5.    I was appointed to my current position as Pastor by the Bishop of the Diocese of Bridgeport. I am responsible for the operations of Notre Dame of Easton parish.

6.    The parish currently has two other full time employees. One is the Director of Religious Education and Pastoral Assistant and the other is a full time priest.

7.    The parish has several part time employees including an organist, a janitor, four secretaries, and two deacons.

8.    All employees, except two of the secretaries who report to the Director of Religious Education, report directly to me. I report to the Bishop.

9.    The parish also has a Parish Council that consists of approximately thirteen parishioners. The council serves as an advisory board to the Pastor and provides information, suggestions and advice to the Pastor on the operations of the church. The Parish Council is only advisory in nature and has no responsibility for any operations of the parish.

- 2 -

315 Post Road West
Westport, CT 06880

HALLORAN
& SAGE LLP

Phone (203) 227-2855
Fax (203) 227-6992
Juris No. 412195

10.    The parish also has a Finance Committee that consists of approximately eight parishioners.  The Committee is responsible for reviewing and analyzing church finances and approves major financial decisions.  The Committee also reviews the annual and quarterly reports, annual expenses, and revenue generated.  The Finance Committee does not have any power to hire of terminate employees.

11.    At Notre Dame Parish of Easton, the Director of Religious Education is responsible for the Parish's religious education program.

12.    The religious education program at Notre Dame of Easton Parish is primarily focused on educating children in the principles and the tenets of Catholic faith and doctrine.  The children are taught about the New Testament, the Old Testament, the sacraments, the role of Jesus in Christian doctrine and life, and principles of the Catholic faith.  This is done through classes that meet throughout the school year on a weekly basis.  The Director of Religious Education is responsible for finding and training parishioners to volunteer to teach the religious education classes.  The classes are for grades one through seven and are held on Tuesday afternoons at two public school grounds because the Parish does not have enough classroom space or a classroom building.  The classes are held for grade eight on Monday evening in the church.  There are currently approximately five hundred children in the religious education program which is roughly the same amount of children that were involved in the program in 2000.

- 3 -

315 Post Road West
Westport, CT  06880

HALLORAN
& SAGE LLP

Phone (203) 227-2855
Fax (203) 227-6992
Juris No. 412195

13.    Also, through these classes and additional studies, children learn about and receive the holy sacraments of penance, communion, and confirmation.

14.    The religious education program also consists of the Rite of Christian Initiation of Adults ("RCIA") which is designed for non-catholic adults who desire to become Catholic.

15.    At Notre Dame of Easton Parish the Director of Religious Education is responsible for the day to day functions of the religious education program and is directly in charge of religious instruction.

16.    While the plaintiff was employed as the Director of Religious Education under my supervision, she: (1) was responsible for recruiting teachers and teachers' aides for the religious education program; (2) monitored the religious education classes that were taught at both schools on a weekly basis; (3) was in charge of religious instructions given to the students in the program; (4) organized high school youth activities; (5) established the curriculum for the religious education program and was responsible for what was taught to the students; (6) was responsible for preparing children to receive the holy sacraments that involved separate spiritual and educational activities and preparation; (7) substitute taught religious education classes whenever a teacher was sick or otherwise failed to appear; (8) organized children's masses; and (9) oversaw and implemented the children's Christmas pageant.

315 Post Road West
Westport, CT 06880

HALLORAN
& SAGE LLP

Phone (203) 227-2855
Fax (203) 227-6992
Juris No. 412195

17.    She also purchased textbooks and to my knowledge selected the books to be purchased and used in the religious education program.  I was not involved in the selection or purchasing of textbooks for the religious education program.

18.    To the best of my knowledge, the plaintiff also performed these duties when Father Hyl was the pastor.

19.    I understand that the plaintiff states that she performed secular or administrative functions as the Director of Religious Education under my supervision such as securing classroom space, arranging insurance coverage for the schools, scheduling classes, making class assignments, maintaining attendance records, meeting with parents, classroom discipline, suggesting tuition rates, forwarding bills for payment, program publicity and preparing budgets.  These tasks were all part and parcel of the religious education program and part of the plaintiff's responsibility of implementing and overseeing the day to day operations of the religious education program and spreading the ministry and Catholic doctrine to the parishioners.  These tasks cannot be separated from the ministerial responsibility and functions of the Director of Religious Education enumerated above.

20.    As the Pastoral Assistant under my supervision, the plaintiff visited the sick and homebound in homes and convalescent homes at least once a month.  The plaintiff also visited the sick and homebound in hospitals once a week.

315 Post Road West
Westport, CT  06880

HALLORAN
& SAGE LLP

Phone (203) 227-2855
Fax (203) 227-6992
Juris No. 412195

21.     As the Pastoral Assistant she also brought communion to the homebound generally twice a month.  Communion can only be distributed to parishioners by trained Eucharistic Ministers.

22.     As the Pastoral Assistant, she trained lectors and Eucharistic Ministers. As mentioned above, Eucharistic ministers are specially trained lay persons who distribute communion to parishioners during mass and on other occasions.  Lectors proclaim readings from the Old and New Testament at mass.

23.     To the best of my knowledge, the plaintiff also performed these duties when Father Hyl was the pastor.

24.     These duties are instrumental to the Pastoral mission of the parish.


_Reverend Monsignor Thomas Driscoll_
Reverend Monsignor Thomas Driscoll

Subscribed and sworn to before me this _3rd_ day of November, 2003.


Notary Public
Commissioner of the Superior Court

480460.1(HS-FP)

- 6 -

315 Post Road West
Westport, CT  06880

HALLORAN
& SAGE LLP

Phone (203) 227-2855
Fax (203) 227-6992
Juris No. 412195

# NOTRE DAME OF EASTON



655 MOREHOUSE ROAD
EASTON, CONNECTICUT 06612
(203) 268-5838 ~ FAX (203) 459-4940

MSGR. THOMAS J. DRISCOLL, V.G.
REV. XAVIER F. RENDA, Parochial Vicar
HAROLD J. LYNCH & DR. GERALD F. SABOL, Deacons
JACQUELINE M. MUSANTE, Pastoral Assistant and
Director of Religious Education ~ 261-5596
FRANK MATTO, Organist and Choir Director~ 335-0894

MASSES:
Saturday ~ (Vigil Mass) 5:00 p.m.
Sunday ~ 8:15 a.m., 10:00 a.m., 12:00 noon
Monday through Friday ~ 7:30 a.m.

SACRAMENT OF RECONCILIATION:
Saturday 4:00 to 4:45 p.m. and Eve of Holy Days

PLEASE CALL THE RECTORY TO ARRANGE FOR BAPTISMS AND WEDDINGS



## EASTER SUNDAY

### The Resurrection of the Lord

April 3rd and April 4th   1999
Mass Intentions for April 3rd through April 11th



| | | | | |
|---|---|---|---|---|
| Sat. | 8:00pm | HOLY SATURDAY | | |
| | | Parishioners Living and Deceased | | |
| | | EASTER SUNDAY | | |
| Sun. | 8:15am | Anthony Testani | | r/b the Family |

# NOTRE DAME OF EASTON



655 MOREHOUSE ROAD (Church)
640 MOREHOUSE ROAD (Rectory)
EASTON, CONNECTICUT 06612
(203)268-5838  -  Fax (203)459-4940

MSGR. THOMAS J. DRISCOLL,  Pastor
REV. XAVIER F. RENDA,  Associate Pastor
Harold J. Lynch & Dr. Gerald F. Sabol,  Deacons
Deacon Ralph Hammock,  Director of Religious
Education & Pastoral Assistant - 261-5596
Alice Evans, Organist & Choir Director-227-8251

## A TITHING PARISH

**MASSES:**

Saturday - Vigil Mass - Seasonal
    4:00p.m. (Nov. thru March)
    5:00p.m. (April thru Oct.)
Sunday - 8:15 a.m., 10:00 a.m., 12:00noon
Monday through Friday - 7:30 a.m.

SACRAMENT OF RECONCILIATION:
Saturday - Seasonal
3:00 to 3:45p.m. (Nov. thru March)
4:00 to 4:45p.m. (April thru Oct.)

PLEASE CALL THE RECTORY TO ARRANGE FOR BAPTISMS AND WEDDINGS

## March 3rd and 4th, 2001

# FIRST SUNDAY of LENT

### FROM THE PASTOR'S PEN

*The Diocesan LOAVES and FISHES LENTEN PROGRAM to feed the hungry of Fairfield County will be held again throughout the Lenten season. We ask individuals and families to put aside the cost of one meal per week, enclose it in a Loaves and Fishes envelope and return the envelope in the REGULAR SUNDAY OFFERTORY COLLECTION. The funds raised are an important source of income for Merton House and St. Charles Food Center in Bridgeport and other food pantries in the the area. Please make a donation in each of the six envelopes provided by our parish. For information, call Catholic Charities at 372-4301. The LOAVES & FISHES ENVELOPE PACKETS will be available in the Church vestibule beginning this weekend, as part of our Parish Lenten Program.*

*Msgr. Driscoll*

~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~

### COMBINED LENTEN PENANCE SERVICE
### MONDAY- MARCH 5TH -7:30pm
#### at Assumption Church, Fairfield

# NOTRE DAME OF EASTON



655 MOREHOUSE ROAD (Church)
640 MOREHOUSE ROAD (Rectory)
EASTON, CONNECTICUT 06612
(203)268-5838 ~ Fax (203)459-4940
Rectory office hours: Monday thru Friday, 9:00am-3:30pm

MSGR. THOMAS J. DRISCOLL, V.G. Pastor
REV. MICHAEL P. LYONS, Associate Pastor
Deacons Harold J. Lynch & Dr. Gerald F. Sabol
Deacon Vincent J. Heidenreich, Director,
Religious Education & Pastoral Assistant ~ 261-5596
Sr. Mary Anthony, C.S.F.N., Youth Minister
Marlane Tubridy, Dir. of Music/Organist~454-9023

**A TITHING PARISH**
Handicapped Accessible Elevator

**MASSES:**
Saturday - Vigil Mass - Seasonal
        4:00p.m. (Nov. thru March)
        5:00p.m. (April thru Oct.)
Sunday - 8:15 a.m., 10:00a.m., 12:00noon
Monday through Friday - 7:30a.m.

**SACRAMENT OF RECONCILIATION:**
Saturday - Seasonal
3:00 to 3:45p.m. (Nov. thru March)
4:00 to 4:45p.m. (April thru Oct.)

## PLEASE CALL THE RECTORY TO ARRANGE FOR BAPTISMS AND WEDDINGS

### Thirtieth Sunday in Ordinary Time
### Mass Intentions for October 25th

October 25th and 26th, 2003
through November 2nd

| Day | Time | Intention | Requested by |
|-----|------|-----------|--------------|
| Sat. | 8:00am | Mass in Honor of Mary & Rosary Dolores Schwartz | r/b the Campbell family |
| | 5:00pm | Peter J. Bellew, Jr. | r/b Mary and Patrick Begley |
| Sun. | 8:15am | John Puskar | r/b Ray and Maria Gaines |
| | 10:00am | Minnie Benedetto | r/b Mary and Mike Larocca |
| | 12:00 noon | Sally Tarick | r/b the George Ganim family |
| Mon. | 7:30am | Jeanne and Robert Ittner | r/b the family |
| Tues. | 7:30am | Elizabeth Senek | r/b Polly Pederson |
| Wed. | 7:30am | Michael Andras | r/b his wife, Florence |
| Thurs. | 7:30am | Lillian Walsh | r/b the McCauley family |
| Fri. | 7:30am | Louis Petrocelli | r/b Tom&Pat Fischer & family |
| Sat. | 8:00am | Parishioners Living and Deceased | |
| | 4:00pm | Eamon Joseph Kelly- 1st Anniversary | r/b the family |
| Sun. | 8:15am | Louis Petrocelli | r/b Vince, Maryann&Jeannine |
| | 10:00am | Parishioners Living and Deceased | |
| | 12:00noon | Salvatore Salvaggio | r/b Tom&Pat Fischer&family |

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - -x

JACQUELINE M. MUSANTE          :

                               :

                               :

VS                             : 301CV

                               : 2352(CFD)

                               :

NOTRE DAME OF EASTON CHURCH     :

- - - - - - - - - - - - - - - - - - -x


    Deposition of JACQUELINE M. MUSANTE taken pursuant
to subpoena and the Federal Rules of Civil Procedure,
before Jacinda A. Grigaitis, Licensed Shorthand
Reporter #00381 and Notary Public within and for the
State of Connecticut, held at the offices of Cohen &
Wolf, 1115 Broad Street, Bridgeport, Connecticut, on
February 3, 2003, at 1:12 P.M.

            DEL VECCHIO REPORTING SERVICES, LLC
              PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE              109 PEARL ST., 14TH FLOOR
MADISON, CT 06443           HARTFORD, CT 06106
203 245-9583                800 839-6867
            DEL VECCHIO REPORTING SERVICES, LLC

---

**Page 2**

ON BEHALF OF THE PLAINTIFF:

COURTNEY A. GEORGE, ESQ.
Cohen & Wolf
1115 Broad Street
Bridgeport, CT 06604


ON BEHALF OF THE DEFENDANT:

THOMAS P. O'DEA, JR., ESQ.
Halloran & Sage
315 Post Road West
Westport, CT 06880

---

**Page 3**

1     IT IS HEREBY STIPULATED AND AGREED by and between

2   counsel representing the parties that each party

3   reserves the right to make specific objections at the

4   trial of the case to each and every question asked and

5   of answers given thereto by the deponent, reserving

6   the right to move to strike out where applicable,

7   except as to such objections as are directed to the

8   form of the question.

9     IT IS HEREBY STIPULATED AND AGREED by and between

10  counsel representing the respective parties that proof

11  of the official authority of the Notary Public before

12  whom this deposition is taken is waived.

13    IT IS FURTHER STIPULATED AND AGREED by and

14  between counsel representing the respective parties

15  that the reading and signing of the deposition by the

16  deponent is waived _____, is not waived_ x_ .

17    IT IS FURTHER STIPULATED AND AGREED by and

18  between counsel representing parties that all defects,

19  if any, as to the notice of the taking of the

20  deposition are waived.

21    Filing of the Notice of Deposition with the

22  original transcript is waived.

---

**Page 4**

1        JACQUELINE M. MUSANTE,

2   Residing at 95 Rock House Road, Easton, Connecticut,

3   having first been duly sworn, deposed and testified as

4   follows:

5   DIRECT EXAMINATION

6   BY MR. O'DEA:

7     Q.  Ms. Musante, my name is Tom O'Dea. I'm from

8   the law firm of Halloran & Sage and we represent Notre

9   Dame of Easton Church who is a defendant in a lawsuit

10  that you brought. We're here pursuant to a Notice of

11  Deposition to take your deposition. I know that you

12  sat through the deposition of Monsignor Driscoll.

13    The same ground rules. If at any point in time

14  I ask you a question you don't understand, let me know

15  and I'll try and rephrase. I'd ask that you wait

16  until I'm finish asking a question before starting and

17  I'll wait until you finish answering before asking

18  another question, because if we both are talking at

19  the same time, it's difficult for the court reporter.

20  It tends to happen towards the end of the deposition,

21  you start to anticipate each other.

22    If at any point in time you want to take a

23  break for whatever reason, please let me know. I

24  would just simply ask that you answer any pending

25  questions.  Okay?

101

1  Q.  Who were you replacing at Notre Dame?
2  A.  A woman named Jean Sheehan.
3  Q.  Okay.  So Jean Sheehan knew that she was going
4  to be leaving in January?
5  A.  Yes.  It was kind of a date that was kind of
6  agreed upon by the pastor and her and I.  She wanted
7  to leave and she didn't want to leave him -- I guess
8  she had made the decision late in the year, and she
9  knew that was not the proper -- the appropriate way to
10 do it.  And so she said, you know, would you be
11 willing to start in January if it's okay with the
12 pastor?  He said it was okay.  And that's how that all
13 worked.
14      There's a lot of work to do before classes
15 begin in October and some of them start in September.
16 You don't come in in September and have 500 kids in
17 classes with teachers and books and things like that.
18 Q.  So it takes the month of July and August and
19 September and to get ready for the October start?
20 A.  It takes time to start, yes, it takes time.
21 Q.  And what takes that amount of time?  What do
22 you do specifically?
23 A.  Recruiting teachers is probably the largest
24 part of the job.
25 Q.  How do you --

102

1  A.  Making class lists of students.
2  Q.  Who decides what teachers to hire?
3  A.  Well, they're mostly volunteer.
4  Q.  Who decides what volunteers to hire?
5  A.  I always recruited people and or ran names of
6  people usually past the pastor and said, you know, I'm
7  thinking about this person, I'm thinking about that
8  person.  Or in some cases the pastors that I worked
9  for would pass on names to me, would say, Have you
10 thought of so and so, she's, you know...
11 Q.  Who would interview the teachers?  Would the
12 director of religious education interview the
13 teachers?
14 A.  Yes.
15 Q.  Would the pastor interview every teacher?
16 A.  I wouldn't say so.
17 Q.  Okay.  The ultimate person responsible for the
18 hiring of volunteers would be the pastor?
19 A.  If he didn't think somebody was suitable, they
20 would not be teaching.
21 Q.  Okay.  I guess my question is could you or did
22 you during your time as a director of religious
23 education ever hire a volunteer without speaking to
24 the pastor first?
25 A.  I can't recall that.  I mean, I would, you

103

1  know, sugge... or send lists of names and the pastor
2  would say okay, or approve them, or say, you know, I
3  don't know them so it's okay for you -- you know, seem
4  all right, that kind of thing.
5  Q.  So there were pastors in the past who have gone
6  on your word on who to hire and who not to hire?
7  A.  You know, pretty much most pastors know their
8  parishioners and they know who the people are.
9  Q.  How big is Notre Dame of Easton parish?
10 A.  I don't know the number of --
11 Q.  Parishioners?
12 A.  -- parishioners.  I don't know.
13 Q.  Did you ever know the number?
14 A.  Possibly.
15 Q.  Can you give an estimate?
16 A.  I couldn't even, no, I'm not good at...
17 Q.  Between 5 and 20,000?
18      MS. GEORGE:  Objection.  Are we talking
19 about now or --
20 BY MR. O'DEA:
21 Q.  Anytime you were the director for religious ed?
22 A.  I honestly can't answer the question.
23 Q.  Was there ever anytime where the pastor that
24 you were working for as the director of religious ed
25 allowed you to select a volunteer that they didn't

104

1  know?
2  A.  I can't even remember that.  I mean I can't
3  recall any.
4  Q.  Okay.  Other than speaking with -- do you
5  recall any other conversation with Father Joe Palacino
6  concerning getting a job other than what you've
7  already described?
8  A.  No.
9  Q.  Do you recall any other part of any
10 conversation you had with Pat Scullion concerning any
11 job other than what we've already talked about?
12 A.  I don't recall any.
13 Q.  Did you have any conversations with anyone else
14 about getting a job?
15 A.  I did with Monsignor Rousseau.
16 Q.  What do you recall about your conversation with
17 Monsignor Rousseau?
18 A.  He said, Oh, Jackie, I just hired somebody.  I
19 would have been -- I wish you had spoken to me before
20 I hired her.
21 Q.  Do you know who he hired?
22 A.  Oh, I can't think of her name.
23 Q.  Is it St. Augustine?
24 A.  Yes.
25 Q.  Do you know if that person is still there?

141

1 BY MR. O'DEA:

2   Q.  Vice versa.  In other words you don't have to
3 be a pastoral associate to be the director of
4 religious education?

5   A.  That's correct.

6   Q.  How did you act as a pastoral associate when
7 Monsignor Driscoll was the pastor?

8   A.  Well, it's easier to say when Father Hyl was
9 the pastor because it changed dramatically when
10 Monsignor Driscoll became the pastor.

11   Q.  How did it change?

12   A.  I -- I had done training for readers and
13 eucharistic ministers, and I didn't get to do any of
14 that.  Just once I think I worked with some people
15 with the microphone for readers when Monsignor
16 Driscoll was the pastor.  I guess my function as
17 pastoral -- under the bailiwick of pastoral associate
18 or pastoral assistant when Monsignor Driscoll was
19 there would be to visit the hospitals and bring
20 communion to some homebound people.

21   Q.  Okay.  When was the last time you gave any
22 spiritual direction or counseling?

23   A.  About a month ago a man that I know came to me
24 and asked to sit down and talk with me about his --
25 somebody who has come to me a number of times.

142

1   Q.  Did you ever give spiritual direction or
2 counseling in your office at Notre Dame?

3   A.  I did after hours once or twice.  I didn't
4 consider -- they were not people from the parish, and
5 it was after hours.  I stayed late for somebody who
6 found that convenient.

7   Q.  And did -- did the pastor at the time know that
8 you were doing that?

9   A.  I don't know that I said that.  I might have
10 said to him, I'll be late tonight or something like
11 that.  But I didn't -- I doubt if I said that
12 specifically.

13   Q.  You wrote in your June 5, 2000 letter,
14 Coordination of some specific phase of total religious
15 education.  What did you mean by that?

16   A.  I'm sorry.  Say that again, please.

17   Q.  Sure.  You wrote, Coordination of some specific
18 phase of total religious education.  What does that
19 mean?

20   A.  It would mean like a -- the preschool program,
21 like coordinating like a preschool program or
22 coordinating a -- like some of the parishes have
23 coordinators that coordinate from K through 3, and
24 some have the intermediate grades, 3 through 5, and
25 some have middle grades of education.  And that would

143

1 be like total \_dious education.

2   Q.  When you say "coordinate," what do you mean?

3   A.  I meant doing exactly what I did as the
4 director of religious education with some part of it.
5 And some parishes have 2,000 students, and they have
6 one person just takes one phase and another person
7 takes another phase like that.

8   Q.  How often did you do the catechist training?

9   A.  I did that for the diocese.  I didn't do it for
10 the parish.

11   Q.  When's the last time you did any catechist
12 training?

13   A.  The -- let's see, I'm trying to remember.  Gee,
14 I can't remember.  It's a couple of years.

15   Q.  The rites of Christian initiation for adults,
16 was that part of your job as a director of religious
17 education?

18   A.  It had been but that was kind of phased out
19 when Monsignor Driscoll came on board.  We had had a
20 nice process of rites of Christian initiation for
21 adults where people who wanted to become Catholic who
22 are adults or, you know, would meet on a regular basis
23 and -- where they would go through ceremonies that the
24 priest would celebrate with them.

25   Q.  Now, did you organize confirmation retreats?

144

1   A.  Insofar as I would do the mailings and arrange
2 for the place and pay the director, I mean, or arrange
3 for the payment for the director and the food and
4 collect the money from the students and so forth.  I
5 did that, yes.

6   Q.  Take a look at Document 129.  Do you recognize
7 that?

8   A.  Uh-huh.

9   Q.  What is that?

10   A.  It's to -- that's prior to Monsignor Driscoll.

11   Q.  Okay.

12   A.  I believe this is when Father Hyl was the
13 pastor.  1997, yeah.  These were the people who were
14 the catechists, who were the teachers for it.

15   Q.  Were these -- withdrawn.  Was this document
16 done as part of your duties as director of religious
17 education?

18   A.  I -- I don't know.  I don't know if it was
19 religious education or pastoral assistant.  I mean
20 it's hard to define.  But it was -- it was that
21 process.  The diocese had instituted this process.

22   Q.  Are the functions of a pastoral -- withdrawn.
23 Were your functions as pastoral associate and director
24 of religious education intertwined during your tenure
25 at Notre Dame ?